[No. A044820. First Dist., Div. Two. Apr. 19, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
HAROLD FRANKLIN FREEMAN, SR., Defendant and Appellant.

COUNSEL

C. Joanne Whitt for Defendant and Appellant.

John K. Van de Kamp, Attorney General, and Laurence K. Sullivan, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

KLINE, P. J.—Harold Franklin Freeman, Sr., appeals from convictions entered upon his pleas of guilty or nolo contendere to one felony count of cultivating marijuana (Health & Saf. Code, § 11358) and misdemeanor counts of possessing methamphetamine (Health & Saf. Code, § 11377, subd. (a)), battery on a peace officer (Pen. Code, § 243, subd. (b)) and carrying a loaded firearm in a vehicle (Pen. Code, § 12031, subd. (a)). He contends that he should be given the opportunity to withdraw his plea because the trial court erred in denying his motion to suppress evidence seized from the trailer in which he was living and the area surrounding the trailer.

## STATEMENT OF THE CASE

On June 30, 1987, appellant was charged by information with three felonies, possession of marijuana for sale (Health & Saf. Code, § 11359), cultivation of marijuana (Health & Saf. Code, § 11358), and possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)), and four misdemeanors, carrying a concealed weapon (Pen. Code, § 12025, subd. (b)), battery on a peace officer (Pen. Code, § 243, subd. (b)), carrying a loaded firearm in a vehicle (Pen. Code, § 12031, subd. (a)), and resisting arrest (Pen. Code, § 148). Appellant pled not guilty on July 17, 1987.

Appellant filed a motion to suppress evidence (Pen. Code, § 1538.5), which was denied on August 14, 1987. On September 18, 1987, the charges of possession of marijuana for sale and resisting arrest were dismissed and appellant changed his plea to guilty or nolo contendere on the remaining charges, with the count of possession of methamphetamine amended to a misdemeanor and the count of carrying a concealed weapon amended to one of possession of a loaded firearm in a vehicle (Pen. Code, § 12031, subd. (a)).

Appellant was sentenced on October 23, 1987, to 16 months in state prison on the cultivation charge, imposition of sentence on the misdemeanor convictions was stayed, and restitution was ordered under Government Code section 13967.[1] Appellant filed a notice of appeal in open court and was released on his own recognizance pending appeal.

## STATEMENT OF FACTS

Appellant's motion to suppress evidence seized from his trailer home, the surrounding area, and his car was submitted on the transcript of the preliminary examination and oral affidavit for search warrant.

On the evening of April 13, 1987, Mendocino County Deputy Sheriff Pressley O. Kent received a telephone call from a citizen with no known criminal or informant history. The caller reported having stumbled upon 17 marijuana plants in a homemade cold frame (miniature hothouse made of cinder, wood and glass) next to a small, camouflaged travel trailer in Williams Valley just off Short Creek Road. The next day, following the informant's directions, Deputy Kent hiked to within approximately 100 yards of what he thought the location would be, where he heard people talking, doors slamming and dogs barking. The area was mountainous, heavily

---

[1] The amount of restitution appears as $100 in the reporter's transcript and $500 in the clerk's transcript.

forested and covered with brush and poison oak; it was not an area where one would expect to find habitation, as there were no utility services and the nearest residence was about two miles away. Deputy Kent remained in the area for about one hour. He did not see any man-made structures but the sounds he heard led him to conclude the informant's information was accurate.

The next day, April 15, Kent returned to the area with deputies Alvin Tripp and Tim Marsh and Louisiana-Pacific Company security officer Doug Goss. The Louisiana-Pacific Lumber Company owned the land adjacent to the area in question, which Kent suspected (and later determined) to be Indian reservation land. The group reached about the same location where Kent had been the day before and heard the same sounds of people talking, dogs barking and doors slamming. At about 100 yards from the location, the group split into two; Kent and Tripp moved to about 75 yards from the area, then Kent moved to about 25 yards away. At this point, Kent saw a small travel trailer camouflaged "quite effectively" with netting, paint, cut brush and other vegetation, as well as a wooden shed and the top of a grey automobile, within a clearing measuring about 45 by 30 feet.

Kent moved to about 25 feet from the cleared area and positioned himself in a clump of trees. He saw a black dog tied up in the clearing, and watched a woman come out of the trailer, walk around the clearing, address someone Kent assumed to be inside the trailer as "dad," and reenter the trailer. The woman came out again, ran up the hill yelling, returned with a dog she played with in the clearing, and went inside. About 10 or 15 minutes later, appellant emerged from the trailer, walked around the yard, returned inside, reemerged complaining about the dog knocking over a trash can and returned inside. After another 10 minutes, appellant came out of the trailer with a rifle and scabbard, walked to the car and returned without the rifle. He then reentered the trailer and came out a minute or two later with an unidentified object and went to the car; the woman came out of the trailer and put a bag in the trunk of the car. Appellant said, "Don't forget the pot," she asked where it was, and he said "in the cupboard." The woman went inside, returned with a brown paper sack, and the two drove away in the car. Kent notified Tripp by radio that the two were leaving, advised that there was a weapon and possibly marijuana in the car, and reported the conversation he had overheard. He heard Tripp notify Deputy Bruce Smith, stationed on the highway, to follow the vehicle and stop it if probable cause could be obtained for a traffic stop.

After contacting Smith, Tripp moved toward the trailer and, from about 100 feet, observed what appeared to be marijuana plants in the cold frame. Tripp told Kent he believed he had seen marijuana plants in growing pots.

Remaining within the trees, Tripp moved closer to the cold frame; when he reached the edge of the clearing, still believing the plants were marijuana, he radioed for the other officers to move in and secure the area while a search warrant was obtained. He also advised the highway unit to arrest the vehicle occupants for cultivation of marijuana. At the preliminary hearing, Tripp guessed that the plants were about three inches tall; asked about the differences between marijuana and tomato plants, he described differences in stalks, leaves and color but testified that one would have to hold the plants to positively confirm they were marijuana.

Upon receiving Tripp's report, Kent left his observation point and walked up to the cold frame to verify for himself the existence of the marijuana. Kent observed 17 growing marijuana plants in pots in the cold frame and two additional seedlings in pots outside the cold frame. At the preliminary hearing, Kent testified that this was the first time he actually observed illegal activity. His observations from within the clearing, however, were not included in the oral affidavit.

Deputy Smith arrested appellant after a violent struggle during which a gun fell from appellant's waistband. A search of appellant's person revealed a metal container with a bindle of methamphetamine and a loaded rifle and scabbard were found in the passenger compartment of the car. Appellant's companion gave the police a bag of marijuana which she said was appellant's.

Deputies Kent and Tripp obtained and executed the search warrant, seizing scales, plastic bags, a box containing marijuana debris and a notebook as well as the marijuana plants in the cold frame. It was stipulated that appellant lived in the trailer.

DISCUSSION

I.

*The Police Observations From Open Fields Were Lawful*

■ "The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" (*California* v. *Ciraolo* (1986) 476 U.S. 207, 211 [90 L.Ed.2d 210, 215, 106 S.Ct. 1809], quoting *Katz* v. *United States* (1967) 389 U.S. 347, 360 [19 L.Ed.2d 576, 88 S.Ct. 507], Hanlan, J., conc.) "*Katz* posits a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" (*Ibid.*) ■ Appellant urges

that he had a reasonable expectation of privacy in the clearing surrounding his trailer and, therefore, that the police entry into and search of the clearing violated his rights under the Fourth Amendment.

Appellant's argument is based on the theory that he exhibited a subjective expectation of privacy by living in a remote area and camouflaging his trailer, and that this expectation of privacy was objectively reasonable because the clearing in which the cold frame was located was part of the curtilage of his home. ■ The curtilage, "the area immediately surrounding and associated with the home" and "to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' . . . has been considered part of home itself for Fourth Amendment purposes." (*Oliver* v. *United States* (1984) 466 U.S. 170, 180 [80 L.Ed.2d 214, 225, 104 S.Ct. 1735].) The curtilage is thus afforded constitutional protection while "open fields" are not. (*Ibid.*) " '[T]he term "open fields" may include any unoccupied or undeveloped area outside of the curtilage. An open field need be neither "open" nor a "field" as those terms are used in common speech.' " (*United States* v. *Dunn* (1987) 480 U.S. 294, 304, 107 S.Ct. 1134, 1141, quoting *Oliver* v. *United States, supra,* 466 U.S. at p. 180, fn. 11 [80 L.Ed.2d at p. 225].) The Supreme Court has noted that a "thickly wooded area" may be an open field as that term is used in construing the Fourth Amendment. (*Oliver* v. *United States, supra,* 466 U.S. at p. 180, fn. 11 [80 L.Ed.2d at p. 225].)

■ For purposes of this case, we may assume without deciding that the clearing was a part of the curtilage of appellant's home.[2] The search warrant in this case was obtained on the basis of an oral affidavit which detailed Tripp's and Kent's observations from outside the clearing and did not mention Deputy Kent's observations from inside the clearing. The evidence is undisputed that Officer Tripp never actually entered the clearing but remained in the surrounding brushy area. Appellant conceded in the trial court that the officers were in "open fields;" the trial court so found and appellant does not dispute this finding on appeal. Police observations while

---

[2] This assumption should not be taken to imply any approval of appellant's theory. While it was stipulated that appellant was living in the trailer, this does not necessarily mean that the trailer and clearing were a "home" and "curtilage" for purposes of Fourth Amendment analysis. (*United States* v. *Ruckman* (10th Cir. 1986) 806 F.2d 1471, 1472-1473 ["home" was cave in remote area on land owned by the United States and controlled by the Bureau of Land Management; no reasonable expectation of privacy because defendant was trespasser subject to immediate ejectment].) Appellant's papers in support of his motion to suppress stated that he was an Indian and believed he could live on the reservation without interference. No determination was made in the trial court—nor any evidence presented—whether appellant in fact had a legal right to be living on this land, how long he had been living or intended to live there, or any similar issues bearing on the reasonableness of his expectation of privacy in the trailer and clearing as a home and curtilage.

in open fields are not searches requiring a warrant. (*United States* v. *Dunn, supra*, 480 U.S. at pp. 300-305 [94 L.Ed.2d at pp. 334-337] 107 S.Ct. at pp. 1139-1141; *Oliver* v. *United States, supra*, 466 U.S. at p. 181 [80 L.Ed.2d at pp. 225-226].)

In *Dunn,* the police entered onto the defendant's ranch without a warrant, crossing a fence surrounding the entire property as well as several interior fences, positioned themselves outside the locked gate of a barn some 50 yards from the residence, and observed what appeared to be a drug laboratory inside the barn. They returned twice the next day to confirm the presence of the laboratory and then obtained a search warrant which they executed two days later. (480 U.S. at pp. 297-298 [94 L.Ed.2d at pp. 332-333] 107 S.Ct. at pp. 1137-1138.) The court held that the barn was not within the curtilage of defendant's home, based on the facts that it was situated 50 yards from the home, was not within the interior fence enclosing the residence, was not being used for intimate activities of the home, and had not been protected from observation by those standing in the open fields. (*Id.*, at p. 302 [94 L.Ed.2d at p. 335, 107 S.Ct. at p. 1140].) The court then considered defendant's contention that he had a reasonable expectation of privacy in the barn and its contents despite their being outside the curtilage because the barn was an essential part of his business. In this regard, the court assumed the barn enjoyed Fourth Amendment protection and could not be entered and its contents seized without a warrant. (*Ibid.*) It held, however, that the observations of the barn were legal because they were made while the police were in the open fields. (*Id.*, at pp. 303-304 [94 L.Ed.2d at pp. 336-337, 107 S.Ct. at pp. 1140-1141].) Noting that the officers never entered the barn or any other structure on defendant's premises, the court stated that "standing as they were in the open fields, the Constitution did not forbid them to observe the phenylacetone laboratory located in respondent's barn." (*Id.*, at p. 337 [94 L.Ed.2d at p. 337, 107 S.Ct. at p. 1141].)

Recognizing that the Fourth Amendment does not preclude observations of the curtilage from a vantage point where the police have a right to be and which renders the activities clearly visible (*California* v. *Ciraolo, supra*, 476 U.S. at p. 213 [90 L.Ed.2d at p. 216]), appellant urges that the officers in the present case did not make their observations from a lawful public place because the area in question was part of an Indian reservation and the officers had not obtained permission to be on the property on that date. The Supreme Court in *Dunn,* however, expressly stated that "there is no constitutional difference between police observations conducted while in a public place and while standing in the open fields." (*United States* v. *Dunn, supra*, 480 U.S. at p. 337 [94 L.Ed.2d at p. 337, 107 S.Ct. at p. 1141].) Appellant's suggestion that the observations here were

not made from a lawful public place is, in essence, a claim that observations made from a location where the officer is a trespasser are unconstitutional. The Supreme Court has expressly rejected this suggestion with respect to observations of illegal activities occurring in open fields: the fact that the intrusion upon an open field would be a trespass at common law does not make it a "search" in the constitutional sense. (*Oliver* v. *United States, supra,* 466 U.S. at p. 183 [80 L.Ed.2d at p. 227].) In *Dunn,* the court clearly applied the same principle to observations of illegal activity in protected areas made *from* open fields, as it upheld the legality of observations by officers who stood in open fields on the defendant's own property without permission.[3] It follows inescapably that the fact the police here stood in open fields on an Indian reservation does not render their observations unconstitutional even if the clearing was the curtilage of appellant's home.[4]

Finally, appellant urges that the criminal activity in this case was not "clearly visible" from outside the curtilage. This point, too, is based on *Ciraolo,* which upheld aerial observations of the defendant's curtilage made from public navigable airspace and revealing plants "readily discernible to the naked eye as marijuana." (476 U.S. at p. 213 [90 L.Ed.2d at p. 217].) Appellant notes Deputy Tripp's testimony that he "believed" the plants were marijuana and that one could only be certain plants of this size were not tomato plants by holding them in one's hand, and Deputy Kent's testimony that the first time he observed illegal activity was when he entered the clearing and walked up to the cold frame.

Appellant's reliance on the issue of certainty of the officers' identification of the plants is mistaken. We do not read *Ciraolo* as requiring the police

---

[3] There is an apparent inconsistency between *Dunn,* which applies the open fields cases to allow observations of constitutionally protected areas whether or not the observer in the open field is a trespasser, and the line of cases appellant relies upon, which allow observations of constitutionally protected areas if made from a place the observer has a lawful right to be. (E.g., *California* v. *Ciraolo, supra,* 476 U.S. at pp. 213-215 [90 L.Ed.2d at pp. 216-218].) The latter cases are based on the view that " '[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment Protection.' " (*California* v. *Ciraolo, supra,* 476 U.S. at p. 213 [90 L.Ed.2d at p. 217], quoting *Katz* v. *United States, supra,* 389 U.S. at p. 351 [19 L.Ed.2d at p. 582].) Thus, the Fourth Amendment does not require police officers "to shield their eyes when passing by a home on public thoroughfares." (*Ibid.*) The theoretical justification for the open fields doctrine is that "an individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers," in part because open fields "usually are accessible to the public and the police in ways that a home, an office or commercial structure would not be." (*Oliver* v. *United States, supra,* 466 U.S. at p. 179 [80 L.Ed.2d at p. 224].) The rule established in *Dunn* allows warrantless searches of areas which are *not* readily open to the public eye because they can only be viewed from areas not themselves open to the public in the traditional sense. Whatever inconsistency there may be in doctrine, however, it is clear that *Dunn* governs the case before us.

[4] In view of this conclusion, we need not determine whether the officers were in a lawful public place or whether appellant has standing to assert that they were trespassers on Indian land.

observations upon which a search warrant is based to demonstrate a *certainty* of illegal activity. Rather, the point in *Ciraolo* is that observations of activity which is clearly visible from a public vantage point may be relied upon in obtaining a search warrant. (476 U.S. at pp. 213-215 [90 L.Ed.2d at pp. 216-218], *United States* v. *Knotts* (1983) 460 U.S. 276, 282 [75 L.Ed.2d 55, 62-63, 103 S.Ct. 1081].) ■ The standard for issuance of a search warrant is probable cause, which exists when the facts stated in the affidavit "make it substantially probable that there is specific property lawfully subject to seizure presently located in the particular place for which the warrant is sought." (*People* v. *Cook* (1978) 22 Cal.3d 67, 84, fn. 6 [148 Cal.Rptr. 605, 583 P.2d 130].) ■ It was not necessary for the officers to identify the plants as marijuana for a certainty if the things and activities clearly visible from their location in the open fields established probable cause to believe marijuana and the related items specified in the warrant would be found on the premises. (See *People* v. *Mayoff* (1986) 42 Cal.3d 1302, 1319-1320 and fn. 12 [233 Cal.Rptr. 2, 729 P.2d 166].) Here, Deputy Tripp expressed no doubt that the plants he observed were marijuana; he merely acknowledged that one would have to hold the plants in the hand to "confirm positively" that they were marijuana. Coupled with Deputy Kent's observations of appellant and his companion and the reference to "pot," we have no question that probable cause was established.[5]

## II.

### *Deputy Kent's Entry Into the Clearing Did Not Invalidate the Subsequent Warrant and Search*

■ Appellant urges that Deputy Kent's entry into the clearing to confirm the presence of marijuana was an illegal search which requires suppression of all the evidence seized. This contention is unavailing because none of the evidence seized was a product of this entry.

■ The exclusionary rule applies not only to evidence obtained as a direct result of an illegal search or seizure but to evidence found to be derivative of such a search or seizure. (*Segura* v. *United States* (1984) 468 U.S. 796, 804 [82 L.Ed.2d 599, 608, 104 S.Ct. 3380].) "The question to be resolved when it is claimed that evidence subsequently obtained is 'tainted' or is 'fruit' of a prior illegality is whether the challenged evidence was ' "come at by exploitation of [the initial] illegality or instead by means *sufficiently distinguishable* to be purged of the primary taint." ' " (*Id.*, at pp.

---

[5]Appellant made no suggestion in the trial court that the officers could not identify the plants as marijuana from outside the clearing; indeed, his trial court papers concede that the police had probable cause to obtain a warrant once they thought they saw marijuana.

804-805 [82 L.Ed.2d at p. 608], quoting *Wong Sun* v. *United States* (1963) 371 U.S. 471, 488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407] [italics added in *Segura*].) Evidence is not to be excluded if police had an "independent source" for its discovery. (*Id.*, at p. 805 [82 L.Ed.2d at p. 608].) In such a case, the "ultimate question . . . is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence . . . ." (*Murray* v. *United States* (1988) 487 U.S. 533, 542, 108 S.Ct. 2529, 2535 [101 L.Ed.2d 472, 483, 108 S.Ct. 2529].) The Supreme Court cautioned that this would not be the case "if the agents' decision to seek the warrant was prompted by what they had seen during the initial [illegal] entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." (*Id.*, at p. 542 [101 L.Ed.2d at pp. 483-484, 108 S.Ct. at pp. 2535-2536, fn. omitted].)

In *Murray,* federal agents observed suspected narcotics traffickers driving vehicles into and out of a warehouse. After the vehicles were lawfully seized and found to contain marijuana, agents forced entry into the warehouse and observed in plain view numerous bales later determined to contain marijuana. The agents left, keeping the warehouse under surveillance, and obtained a search warrant without mentioning or relying upon any observations during the entry into the warehouse. They then executed the warrant and seized the marijuana and lists of customers. The court observed that while knowledge of marijuana being in the warehouse was acquired during the illegal entry, it was also acquired during the entry pursuant to the search warrant and determined the independent source doctrine should apply as long as the later acquisition was not the result of the illegal entry. (487 U.S. at p. 541 [101 L.Ed.2d at p. 483, 108 S.Ct. at p. 2535].) "Invoking the exclusionary rule would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one." (*Ibid.*, italics in original.) Since the magistrate had not been informed of the observations during the illegal entry, *Murray* raised no question that the warrant might have been issued on the basis of such observations. The court concluded, however, that the case had to be remanded because the District court had not explicitly determined that the agents would have sought a warrant if they had not earlier entered the warehouse. (*Id.*, at p. 543 [101 L.Ed.2d at p. 484, 108 S.Ct. at p. 2536].)

We may again assume for the sake of argument that appellant had a constitutionally protected interest in the clearing such that Deputy Kent should not have entered it without a search warrant. Appellant urges that the independent source doctrine is inapplicable because Tripp's observations and Kent's confirmation were inextricably connected as part of the same event and the only evidence showing that the warrant search was wholly independent of the illegal entry was the testimony of the deputies

who conducted the illegal search. It is clear from the transcript of the oral affidavit, however, that Kent's observations while in the clearing were not related to the judge and therefore could not have played a part in the issuance of the warrant. It is also clear that Tripp made the decision to secure a search warrant *before* Kent entered the clearing. (See *U.S.* v. *Salas* (9th Cir. 1989) 879 F.2d 530, 538 [district court conclusion that warrant search constituted independent source for evidence supported because officer testified decision to obtain warrant reached before illegal entry.]) The officers' testimony in this regard was not disputed, and it is difficult to imagine how it could have been: while appellant urges that the officers' testimony was not credible, the two judges below clearly found their testimony credible in general and there is no reason to assume a different result on this particular. The undisputed testimony that the officers had decided to obtain a warrant prior to any arguably illegal conduct distinguishes this case from *Murray* and others which have followed its course of remanding for determination of the independent source issue. (E.g., *People* v. *Koch* (1989) 209 Cal.App.3d 770 [257 Cal.Rptr. 483]; *United States* v. *Holzman* (9th Cir. 1989) 871 F.2d 1496, 1514.) We therefore conclude that a remand for determination whether the officers would have sought a search warrant if Deputy Kent had not entered the clearing would be a meaningless gesture.[6]

The judgment is affirmed.

Smith, J., and Peterson, J., concurred.

---

[6] Appellant's contention that items seized during his arrest should be suppressed because the arrest was a result of the illegal search is also unfounded. The undisputed testimony shows that Tripp directed Smith to arrest the suspects for cultivation of marijuana before Kent entered the clearing.