Filed 4/20/15  P. v. Williams CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065513 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD247110) |
| DONALD D. WILLIAMS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy R. Walsh, Judge.  Affirmed.

Laurel M. Nelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

Donald Williams was charged with two counts of child abuse (Pen. Code, § 273a, subd. (a),[1] counts 1 & 2) and one count of possession of marijuana for sale (Health & Saf. Code, § 11359, count 3). The information alleged, as to count 3, that Williams was armed with a .45 caliber handgun and a .22 rifle within the meaning of section 12022, subdivision (a)(1). Williams filed a motion to suppress evidence, pursuant to section 1538.5, and a motion to quash the search warrant. The motions were heard based on the evidence presented at the preliminary hearing, and both motions were denied.[2] Williams appeals from the orders denying his motions to suppress and to quash the warrant.

I

FACTS

A. The Warrantless Search

On the morning of March 23, 2013, Juanita Jones called 911 to report there were two black males selling narcotics at a blue tri-unit apartment complex next to a liquor store on Poplar Street in San Diego, California, and that males at that location had

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] However, after hearing the evidence at the preliminary hearing, the court bound Williams over only on count 3 and the enhancing allegations appended to that count. After his renewed motions to suppress and quash were denied, the prosecution filed an amended information adding a count of carrying a concealed weapon (§ 25400), and Williams entered into a plea agreement pursuant to which he agreed to plead guilty to the latter count in exchange for a dismissal of count 3, with the further agreement that he would receive probation and, after two years of successful probation, would be allowed to withdraw his plea to the felony and to plead to misdemeanor violation of section 496.

2

previously threatened to shoot her. She also stated the building had security cameras. No information about the height, weight, stature, or clothing of the suspects was reported.

San Diego Police Sergeant Sharki and Officers McAndrew and Creazo responded to the scene a few minutes later. They located the blue apartment building and observed there were high definition surveillance cameras mounted on the roof, which can be employed by narcotics dealers to see the comings and goings of police and potential customers. Police had received previous complaints about narcotics dealings at that location.

The building consisted of three individually addressed apartment units (4220, 4222 and 4224 Poplar Street, and the land on which the building sat was surrounded by a fence made of differing materials (wrought iron, chain link and wood, depending on the location), and all three units, as well as the front portion of the apartment complex, were visible from the street (as well as from the parking lot of a liquor store) through the wrought iron fence. Each apartment had a front door facing the liquor store parking lot and a back door that led to a common back walkway. There was nothing separating the back walkway from the front yard area. There was also a detached garage in the back of the building, connected by a breezeway, and between the residences and garage was an "inlet" not visible from the street. At the rear of the building is a public alleyway separated from the property by a five-to-six-foot fence.

Sergeant Sharki and Officer Creazo went to the public alleyway in back, where they were later joined by Officer McAndrew. Williams saw the officers and challenged them, asking what they were doing there. Creazo, who is about 6'3" or 6'4," could see

3

over the fence but Sharki, who stands about 5'10," could only see Williams's eyes. The officers told Williams they wanted to speak with him inside the grounds of the complex but he refused and walked away. The officers were concerned when Williams walked away because they did not know if he was retrieving a weapon or going to discard drugs or weapons.

Williams disappeared momentarily and then returned with a phone to where the officers were standing and told them he had the manager on the phone if they wanted to speak to the manager. The officers replied they did not want to speak to the manager but instead wanted to speak to him. Williams declined and left the back area. Officers Creazo and McAndrew also left the alleyway where they had spoken to Williams, but Sharki remained, although he stepped out of sight so that if Williams returned he would think Sharki left with the others. Williams then reappeared, looked around to see if anyone was watching, and then put his hand in his pocket and then reached with that hand toward an open window of 4222 Poplar, and a hand inside reached out and contacted his hand. Williams then walked away.

Creazo, after hearing Sharki state over his radio that he had seen a hand-to-hand transaction, jumped over the wrought iron fence separating the apartments from the liquor store parking lot, and opened the gate to allow McAndrew inside the fence. Williams was upset the officers had entered the yard, and asked what they wanted and why they were in his yard. They handcuffed Williams, conducted a pat-down search for weapons, obtained his permission to search his person for identification and for anything illegal he was carrying, and put him in a patrol car. They found a credit card in the name

4

of Laura Eaker. After Williams told them it belonged to his girlfriend with whom he lived and that she was inside the 4224 Poplar Street apartment, officers knocked and Eaker answered. She confirmed he had permission to have the card but then became uncooperative and closed the door.

Additional officers arrived and did a "cursory" security check of the area inside the fence because the initial report indicated there were two males involved in narcotics sales and had mentioned a firearm. Officers found a second black male, Mr. King, in the back covered patio area. The patio area, a common area available to everyone in the complex, was sheltered only by a wood roof and had no fencing or anything else separating it from the open-air back walkway. King was sitting on a couch looking at some monitors, which showed four screens with seven "feeds" from the surveillance cameras. King said he did not live there but was visiting to get some papers signed.

From the walkway, officers were able to see into the patio area. They saw, in plain view in the patio area, what appeared to be a handgun (which turned out to be a BB gun), as well as a container of marijuana, a bong, a stun gun, and a replica rifle. They also noticed the garage door was reinforced and there was electrical wiring running into the garage, raising suspicions the garage was being used to grow marijuana, because it takes a lot of power to grow marijuana indoors.[3]

An interview with Williams's landlady was admitted into evidence. The landlady's interview confirmed all tenants had equal access to the covered patio area, which was a

---

[3]     Police had also noticed, on the back walkway, plastic pots and pinto beans (which can also facilitate growing marijuana) and a "Grow Bible."

5

common area, and Williams had no authority to exclude other tenants from that area. Williams's brother, who lived in the apartment next door to Williams, also testified the people living at the complex had access to the yards inside the fence and that the covered patio area contained furnishings belonging to both Williams and the landlady.

B. The Warrant

Officer McAndrew subsequently went to a police substation to apply for a telephonic warrant. In this application, McAndrew described Jones's 911 call, the configuration of the property, Williams's detention, and the items discovered in plain view on the walkway and patio. He did not mention officers had been required to jump the fence to detain Williams, or that officers had been on site for several hours already.

After securing the warrant, officers searched Williams's apartment and the garage, and found a loaded .45 caliber gun, a rifle, a substantial quantity of marijuana, a digital gram scale, and baggies.

II

LEGAL STANDARDS

A. General Principles

The Fourth Amendment protects from unreasonable search and seizure only those areas in which a person has a reasonable expectation of privacy. (*People v. Freeman* (1990) 219 Cal.App.3d 894, 900; *California v. Greenwood* (1988) 486 U.S. 35, 39-40.) To claim a Fourth Amendment protection, therefore, a defendant must manifest not only his or her own subjective expectation of privacy in the particular place, but that the

expectation must be one society is prepared to recognize as reasonable. (*People v. Camacho* (2000) 23 Cal.4th 824, 830-831 (*Camacho*).)

B. Standard of Review

" ' "An appellate court's review of a trial court's ruling on a motion to suppress is governed by well-settled principles. [Citations.] [¶] In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] 'The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review.' [Citations.] [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, . . . is also subject to independent review." ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 255.)

III

ANALYSIS

A. Motions and Rulings

Williams moved to suppress the materials seized from the patio, the yard, and the apartment, arguing the entry into the fenced yard, when Officer Creazo jumped over the locked wrought iron fence and opened the gate to allow McAndrew inside, was a warrantless entry that was itself a violation of the Fourth Amendment, and any materials

7

obtained during that initial entry should be suppressed. He also asserted that, because the resulting search warrant for the apartment depended on information obtained during the initial illegal entry into the yard, any result of the search pursuant to that warrant was the fruit of the poisonous tree and should also be suppressed. He also argued the search warrant should be quashed because it was the product of omissions of material facts and inclusion of false facts. The prosecution opposed both motions.

The motions were heard in connection with Williams's preliminary hearing and were based on the evidence introduced at that hearing. The court found, as to the search warrant, the warrant was not obtained based on false statements, and any facts omitted from the application were not material, and therefore denied the motion to quash the search warrant. The court also found, as to the initial entry into (and subsequent observations around) the common areas, although the officers did enter into the property and move about the common areas without permission, the absence of permission for the entry and sweep of the exterior areas was not "legally significant" because Williams had no reasonable expectation of privacy in the outside areas the officers entered and inspected. Accordingly, the court denied the motion to suppress.

B. The Motion to Suppress Evidence Found During the Pre-warrant Activities

Williams argues his motion to suppress should have been granted because (1) Sharki's observations of Williams's furtiveness and possible drug transaction (on which officers partly relied for the subsequent entry into the yard) themselves violated the Fourth Amendment, and (2) the entry into the locked enclosure surrounding the common area required either a warrant or exigent circumstances, and neither were present here.

8

*Sharki's Observations*

We are not persuaded by Williams's claim that Sharki's observations over the fence violated Williams's Fourth Amendment rights. An officer's observations, from a vantage point where he or she is entitled to be, do not amount to a search in violation of the Fourth Amendment. (*Camacho, supra,* 23 Cal.4th at pp. 831-832 [police observations while standing in place where they had right to be not a search in constitutional sense].) As the United States Supreme Court explained:

> "That the area [where the defendant was located when observed] is within the curtilage does not itself bar all police observation. The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible. [Citation.] 'What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.' [Quoting *Katz v. U.S.* (1967) 389 U.S. 347, at p. 351.]" (*California v. Ciraolo* (1986) 476 U.S. 207, 213.)

Williams does not dispute Sharki was standing in a place he was entitled to stand—a public alleyway—and was able to see through or over the fence to observe Williams's actions while he stood outside his abode and in a common area accessible to all tenants. Peering over a fence does not violate the reasonable expectation of privacy protected by the Fourth Amendment. As explained in *People v. Chavez* (2008) 161 Cal.App.4th 1493, 1502:

> "Looking over a fence is not conduct that 'too closely resembles the process of the police state.' [Quoting *Lorenzana v. Superior Court* (1973) 9 Cal.3d 626, 629.] Indeed, courts in various other jurisdictions agree that this sort of conduct does not violate a

9

reasonable expectation of privacy. (See, e.g., *Sarantopolos v. State* (Fla. 1993) 629 So.2d 121 [officer standing on tip toes to look over six-foot fence did not search the enclosed yard: the fence created no reasonable expectation of privacy since it shielded the yard from view of only those not tall enough to see over it]; *State v. Corra* (1987) 88 Or.App. 339 . . . [officer's view of marijuana while standing on a rock to peer over a six-foot fence was not search: many people were tall enough to see what he saw over the fence]; *People v. Smola* (1988) 174 Mich.App. 220 . . . [officers observed marijuana by standing on car bumper and looking over a six-foot fence was not a search; Smola had no reasonable expectation that the fence would shield his backyard from observation].)"

The California cases are in accord. See, e.g., *Dillon v. Superior Court* (1972) 7 Cal.3d 305, 311 [backyard vulnerable to observation from a neighbor's second-story window carries no reasonable expectation of privacy and is, in essence, open to public view]; *People v. Claeys* (2002) 97 Cal.App.4th 55, 59 [no expectation of privacy to marijuana plants in backyard visible over a fence from neighbor's yard]; *People v. Arroyo* (1981) 120 Cal.App.3d Supp. 27, 30 [finding marijuana plant in plain sight where officer looked around tree from common carport area].)

Williams asserts this case should be controlled by *People v. Lovelace* (1981) 116 Cal.App.3d 541. In *Lovelace*, the officer was able to view the contraband by coming within an inch or two of a six-foot-high fence that the officer "could neither see over nor under," and peering through a knothole. (*Id*. at p. 547.) The court noted the fence, which surrounded the backyard of a private residence and had been "repaired and tightened up in order to shield the backyard from public view . . . for purposes of insuring privacy" (*id*. at pp. 548-549), created an expectation of privacy that was both subjectively and objectively reasonable. (*Ibid*.) The court concluded that because the officer was only

10

able to view the contraband by standing at "a vantage point not expected to be used by the public at large," the search violated the defendant's reasonable expectation of privacy. (*Id*. at p. 554.)  We need not definitively determine whether *Lovelace* remains viable because it is distinguishable.[4]  Here, Sharki merely stood on his tiptoes to obtain a vantage point over a fence that his taller partner (standing in a public alley way) could readily obtain, not a fence an officer "could neither see over nor under."  (*Lovelace, supra*, 116 Cal.App.3d at p. 547.)  Moreover, the area into which Sharki peered was not "[tightly sealed] up in order to shield the backyard from public view . . . for purposes of insuring privacy" (*id*. at pp. 548-549), but instead was an amalgam of materials permitting easy views into the area where Williams stood during the hand-to-hand exchange.  Most importantly, Williams was in a common area shared with multiple residences, not a private yard so tightly sealed from public view that his expectation of privacy can be deemed objectively reasonable.  (*People v. Shaw* (2002) 97 Cal.App.4th 833, 839 [defendants "going out into the common area of an apartment complex and placing drugs in a hole in the ground is simply not the sort of activity reasonably tied to any proper expectation of privacy"] (*Shaw*).)  We conclude Sharki's observations did not violate Williams's Fourth Amendment rights.

---

[4]     *Lovelace* was decided before voters in 1992 approved Proposition 8, which forbids the courts of this state to order the exclusion of evidence at trial as a remedy for an unreasonable search and seizure unless exclusion is required by the federal Constitution as interpreted by the United States Supreme Court.  (*Camacho, supra*, 23 Cal.4th at p. 830.)

11

*The Entry Into the Locked Yard*

Williams asserts that, because officers entered the shared common area by jumping over a locked gate, that entry constituted a trespass onto the curtilage surrounding his apartment for which a warrant was required. As a result, he contends all subsequent observations by the officers from their vantage point inside the fenced area (e.g. the contraband, weapons and paraphernalia found in the patio area) should have been suppressed as a product of a warrantless entry.

The courts of this state, as well as the federal courts, have increasingly recognized that because the touchstone of the Fourth Amendment is whether the defendant has a reasonable expectation of privacy in the areas into which the police enter, the concepts of a curtilage in the context of the shared common areas in multi-unit complexes require recognition that such common area curtilages have a lowered expectation of privacy than might the same space surrounding a single family residence. (See, e.g., *Shaw, supra,* 97 Cal.App.4th at p. 835 [it is a "truism of apartment dwelling . . . that what might be one person's curtilage, in the context of a private single occupancy residence, becomes less subject to privacy expectations in the context of the grounds of a multi-unit apartment complex"], fn. omitted.) When assessing whether police conduct offends the Fourth Amendment, the " 'existence of a physical trespass is only marginally relevant to the question of whether the Fourth Amendment has been violated . . . .' [Quoting *U.S. v. Karo* (1984) 468 U.S. 705, 712-713.] Rather, the relevant inquiry is whether entry is made into an area impliedly open to the public." (*People v. Chavez, supra,* 161 Cal.App.4th at p. 1500.)

12

It appears that, on the issue of whether an individual can have a reasonable expectation of privacy in the common or shared areas of a multi-unit residential dwelling, "most circuit courts have found that 'shared' or 'common' areas in apartment complexes or multi-unit dwellings, such as hallways, entryways, and basements, are not areas over which an individual tenant can have a reasonable expectation of privacy." (*U.S. v. Maestas* (10th Cir. 2011) 639 F.3d 1032, 1038.) Thus, the court in *U.S. v. Nohara* (9th Cir. 1993) 3 F.3d 1239, 1242 held a tenant in an apartment complex had no reasonable expectation of privacy in the common area hallway outside his apartment, and the court in *U.S. v. Acosta* (3d Cir. 1992) 965 F.2d 1248, 1254-1257 held the defendant did not have a reasonable expectation of privacy in the backyard of a three-story, multi-unit apartment building shared by the tenants and landlord and "the fact that defendants had permission to use the yard did not create any legitimate expectation of privacy in it." As the court explained in *U.S. v. Miravalles* (11th Cir. 2002) 280 F.3d 1328, 1332, apartment tenants "have little control over those areas, which are available for the use of other tenants, friends and visitors of other tenants, the landlord, delivery people, repair workers, sales people, postal carriers and the like. [Citations.] The reasonableness of a tenant's privacy expectation in the common areas of a multi-unit apartment building stands in contrast to that of a homeowner regarding the home and its surrounding area, over which the homeowner exercises greater control."

It appears most courts have found this reasoning applies even to those multi-unit complexes containing just a few units, as present here. (See, e.g., *U.S. v. McCaster* (8th Cir. 1999) 193 F.3d 930, 931-933 [holding a tenant of a two-unit complex had no

13

reasonable expectation of privacy in the shared hall closet of the dwelling, accessible by two other tenants and the landlord]; *U.S. v. McGrane* (8th Cir. 1984) 746 F.2d 632, 634 [holding the defendant had no Fourth Amendment right to privacy in the basement of a four-apartment residence, accessible to all tenants and the landlord, and fact that the officer "gained entry to the basement as an uninvited person does not affect this analysis. Our inquiry focuses on [defendant's] expectations of privacy, not the propriety of [the officer's] conduct. . . . [T]he agent's status as a trespasser was 'of no consequence' in determining whether there was an expectation of privacy.].) For example, in *U.S. v. Fields* (2d Cir. 1997) 113 F.3d 313, police entered a fenced-in rear yard and from there went into the fenced-in side yard of a three-family apartment house and peered into a window, the shade of which was partially raised. They looked into the window and saw the defendants bagging what appeared to be crack cocaine. (*Id*. at pp. 317-318.) Rejecting the defendant's claim that these observations constituted information obtained by a search violating the Fourth Amendment, the *Fields* court reasoned that:

> "Although society generally respects a person's expectations of privacy in a dwelling, what a person chooses voluntarily to expose to public view thereby loses its Fourth Amendment protection. [Citation.] Generally, the police are free to observe whatever may be seen from a place where they are entitled to be. [Citation.] [¶] In the case at hand defendants conducted their illegal activities in plain view of a bedroom window facing onto *the side yard—a common area accessible to the other tenants in the multi-family apartment building—in which they had no legitimate expectation of privacy.* [Citation.]. . . Their illegal activities . . . could therefore readily be seen by anyone standing in the side yard. [¶] . . . [D]efendants assert the police were trespassing by being in the side yard and that therefore any observations made from that vantage point were automatically unlawful. Although police observations made when trespassing are usually improper, it is not the trespass itself which

14

renders them unlawful. Instead, such observations generally violate Fourth Amendment rights simply because those observed cannot reasonably anticipate observation from vantage points obtained by trespassing. In such circumstances, society frequently respects as reasonable the expectation that such observations will not occur. The ultimate focus of Fourth Amendment analysis remains whether the defendant had a reasonable expectation of privacy in the place searched. [Citation.] Here, *by conducting their activities in plain view of an area where others were free to come and go, defendants failed to demonstrate such an expectation*." (*Id.* at pp. 321-322, italics added.)

California courts have adopted a similar approach. For example, in *Shaw*, *supra*, 97 Cal.App.4th 833, police officers observed (over a fence) the defendant twice entering the backyard of a four-unit apartment complex and retrieving something from the ground near the fence. Police entered the backyard through a break in the fence and found a piece of wood covering a hole that contained several pieces of rock cocaine. (*Id.* at pp. 836-837.) This court, rejecting the defendant's argument that he had a reasonable expectation of privacy in the backyard area violated by the entry into the yard, explained "what might be one person's curtilage, in the context of a private single occupancy residence, becomes less subject to privacy expectations in the context of the grounds of a multi-unit apartment complex, as in this case. [¶] It is upon this lowered expectation of privacy in a common area, as opposed to a private area, that we distinguish the case before us from [*Camacho. supra,* 23 Cal.4th 824] . . . , which held an intrusion by police into the curtilage of a residence violated the occupant's legitimate privacy expectations." (*Id.* at pp. 835-836, fns. omitted.) This court reasoned that "[t]he dispositive factor here is that [the defendant] was not in exclusive control of the area in which he secreted the narcotics. 'One of the main rights attaching to property is the right to exclude others,

15

[citation] and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude.' [Quoting *Rakas v. Illinois* (1978) 439 U.S. 128, 143, fn. 12.] [The defendant], who had the burden on the issue, introduced no evidence of any right to exclude others from the common area of the apartment complex." (*Id.* at pp. 839-840, fn. omitted.)

We recognize that other federal and state courts, when addressing whether an apartment dweller has a reasonable expectation of privacy in common areas open to other tenants and their invitees that is protected by the Fourth Amendment, appear to reach conclusions contrary to the previously cited authorities. (See, e.g., *Fixel v. Wainwright* (5th Cir. 1974) 492 F.2d 480, 484 [concluding apartment dweller had reasonable expectation of privacy in backyard when it was "not a common passageway normally used by the building's tenants for gaining access to the apartments. . . [citation] [n]or . . . open as a corridor to salesmen or other businessmen who might approach the tenants in the course of their trade"]; *U.S. v. King* (6th Cir. 2000) 227 F.3d 732, 749-750 [tenant in two-unit apartment building has a reasonable expectation of privacy in the common areas of the building not open to the general public and in area shared only by the duplex's tenants and the landlord]; *People v. Killebrew* (1977) 76 Mich.App. 215, 217-218 [hallway shared by tenants in a private multiple-unit dwelling is private space intended for use of occupants and their guests in which the occupants have a reasonable expectation of privacy].) We nevertheless are convinced that the approach adopted by this court in *Shaw*, as well as by the numerous federal courts previously cited, is the correct approach to evaluating the facts of this case.

16

Here, Williams lived in a three-unit complex, the exterior areas of which, including the area into which Creazo and McAndrew "trespassed" to make the initial detention of Williams, were largely open to public view from the street. Moreover, all of the tenants and their invitees, as well as the landlady, had full access to all of the common areas, including the patio and back walkway where the evidence was spotted by the officers, and there was no evidence Williams made any effort to exclude those other tenants, their invitees, or the landlady from that patio and back walkway. We conclude, on these facts, Williams did not have an objectively reasonable expectation of privacy in those areas, and therefore the trial court correctly refused to suppress the observations made by police within those areas.

C. Motion to Quash the Search Warrant and Suppress Evidence Found in Apartment

Williams argues the search warrant should have been quashed because the affidavit presented to the magistrate contained material omissions and deliberate misrepresentations.[5] The framework for challenging a warrant is set forth in *Franks v. Delaware* (1978) 438 U.S. 154. A defendant must first show, by a preponderance of the

---

[5] Williams also argues on appeal the warrant should be quashed because affidavit contained illegally obtained information—Sharki's initial observations and the subsequent observations by the officers after their entry into the locked yard—which requires this court to delete that information and then test the validity of the warrant based on the remaining legally obtained information. (*People v. Chapman* (1984) 36 Cal.3d 98, 113, disapproved on other grounds in *People v. Palmer* (2001) 24 Cal.4th 856, 867; *People v Weiss* (1999) 20 Cal.4th 1073, 1075-1081.) However, because we have rejected his claims and concluded those searches did *not* violate his Fourth Amendment rights, we necessarily reject Williams's subsidiary claim that the information obtained by those officers must be disregarded in testing the validity of the warrant.

17

evidence, the affidavit in support of the warrant contained statements that are deliberately false or made in reckless disregard of the truth, and mere negligent statements may not be challenged. (*Id.* at pp. 155-156.) The defendant must also show that the affidavit's remaining contents, after the false statements are excised, are insufficient to support a finding of probable cause. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 988-989.) A defendant who challenges a search warrant based on an affidavit containing alleged omissions must satisfy the same standard (*People v. Luttenberger* (1990) 50 Cal.3d 1, 15, fn. 4)[6] and must show the omissions were material, in light of the totality of the circumstances, to the determination of probable cause. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1297.)

In the proceedings below, Williams contended the affidavit relied on the following false facts and culpable omissions: (1) Sharki claimed to have seen a hand-to-hand transaction but that claim should be disbelieved; (2) McAndrew stated Williams tried to hide from the officers when in fact he did not; (3) McAndrew stated Sharki had seen an

---

6      That is, the defendant bears the burden of showing the omission was material and attributable to culpable conduct. (See, e.g., *People v. Crabb* (1987) 191 Cal.App.3d 390, 393, fn. 3 [requirement for showing willfulness or recklessness applies to omissions], cited with approval in *People v. Luttenberger*, *supra*, 50 Cal.3d at p. 15, fn. 4.) Although *People v. Kurland* (1980) 28 Cal.3d 376, 387-388 arguably stated a different approach for treating omissions, *Kurland* was decided before the adoption of Proposition 8 and is therefore of doubtful continuing vitality. (See *People v. Luevano* (1985) 167 Cal.App.3d 1123, 1127-1129.) Instead, the *Franks* approach is to be applied to omissions (*People v. Luttenberger, supra*), and as the court in *U.S. v. Allen* (8th Cir. 2002) 297 F.3d 790, 795 explained, "To prevail on a *Franks* claim *based on omissions of fact*, [the defendant] must prove first that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading, and, second, that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." (Italics added.)

object transferred when Sharki had only seen a hand-to-hand contact; (4) McAndrew did not mention Williams stated he did not want the officers to enter the property or that McAndrew jumped a fence to get into the property; (5) McAndrew stated Williams was carrying a two-way radio and that someone inside Williams's apartment was carrying its matching radio but did not state the person inside holding the matching two-way radio was Williams's four-year-old son; and (6) McAndrew did not tell the magistrate the configuration of the common area or how long officers had been inside the common area before they contacted the magistrate. The court found, as to the search warrant, the warrant was not obtained based on false statements as to Sharki's belief he saw a narcotics handoff, but instead found Sharki's testimony about what he saw to be credible. As to the facts allegedly omitted from the application, the court concluded none of the omitted facts were material to whether there was probable cause to issue the warrant. Accordingly, the court denied the motion to quash the search warrant.

Williams on appeal claims the motion to quash should have been granted because, if the above allegedly false facts are corrected and the above omitted facts are inserted into the affidavit, there would not have been probable cause to issue the warrant.[7]

_____

[7]     On appeal, Williams goes well beyond the facts raised at trial and identifies a laundry list of additional "omitted" facts this court should consider when assessing whether the warrant should have been quashed, arguing "[i]t is reasonable to infer, from the scope and number of errors and omissions in the McAndrew affidavit, that he was either intentionally or recklessly tailoring his statements to [obtain the warrant]." We decline to consider these newly raised claims because it does not appear these were interposed below. Because the parties did not litigate this claim, the trial court necessarily was deprived of the opportunity to decide the peculiarly factual issue of whether these omissions were made reasonably (or even negligently), or were instead recklessly inaccurate or intentionally misleading (as required under the *Franks* approach,

(*People v. Lewis and Oliver, supra,* 39 Cal.4th at pp. 988-989.)  We are not persuaded.

The affidavit, after replacing the "false" fact that Williams "tried to hide" with the true

fact that Williams "walked away" when officers asked to speak with him, showed a

citizen informant reported two black males were selling narcotics at a blue building next

to a liquor store and had bragged to her about having security cameras that would prevent

police from catching them; police arrived at the location and confirmed the building and

security cameras matched the description given by the informant; police contacted

Williams, who walked away from them; Sharki observed Williams engage in an apparent

narcotics transaction with someone inside 4222 Poplar Street; police detained Williams

and found a two-way radio on his person and, when they knocked on the door of 4224

Poplar Street, they saw the matching two way radio inside the apartment; a sweep of the

common areas located a sophisticated surveillance system with multiple high-definition

cameras providing a live feed to multiple screens; police found weapons in plain view as

well as marijuana in the common areas; and, police found equipment of a kind commonly

used to grow marijuana along with a "Cannabis Grow Bible" and power cords running

from an exterior source into a detached garage.

　　　We are confident the observed facts, standing alone and as corroborative of the

citizen informant's tip (*People v. Superior Court* (*Haflich*) (1986) 180 Cal.App.3d 759,

767-768 [probable cause may be supplied by information from a citizen informant, and

"necessary showing of reliability in the case of a citizen informant 'is significantly less

---

see fn. 6, *ante*), and Williams cannot obtain reversal based on a theory never brought to
the trial court's attention.  (See, e.g., *People v. Lilienthal* (1978) 22 Cal.3d 891, 896.)

than that demanded of a police informer" and "absent circumstances casting doubt on their reliability, citizen informants should be considered reliable"]), provided substantial probable cause on which to issue the search warrant.

D. The Unlawful Detention

Williams contends he was unlawfully seized in the common areas of his building because police lacked probable cause to detain him. We conclude Williams cannot raise this claim on appeal.

"[A] motion to test the validity of a search or seizure must be raised in the superior court to preserve the point for review on appeal. [Citations.] A motion made on the wrong ground in the superior court does not preserve the issue." (*People v. Miranda* (1987) 44 Cal.3d 57, 80, disapproved on other grounds in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4.) "[I]t would be wholly inappropriate to reverse a superior court's judgment for error it did not commit and that was never called to its attention." (*People v. Lilienthal, supra,* 22 Cal.3d at p. 896, fn. omitted.) All parties face the obligation of presenting all their testimony and arguments relative to the question of the admissibility of evidence at trial or by pretrial motion, and " '[t]o allow a reopening of the question on the basis of new legal theories to support or contest the admissibility of the evidence would defeat the purpose of Penal Code section 1538.5 and discourage parties from presenting all arguments relative to the question when the issue of admissibility of evidence is initially raised.' " (*People v. Shuey* (1975) 13 Cal.3d 835, 847, disapproved on other grounds in *People v. Bennett* (1998) 17 Cal.4th 373, 389-390, fn. 4.)

21

Williams's papers filed in support of the motion before the trial court, and the evidence and arguments made at the hearing, solely addressed the issues whether the warrantless search of the common areas, and the search warrant and subsequent search pursuant to that warrant, violated the Fourth Amendment. No issue was raised in any manner suggesting the detention was unjustified at its inception or in its duration. Although, broadly stated, a detention and search of public and private areas fall within the protection against illegal searches, their resolutions implicate different facts and require different analyses. We therefore conclude Williams waived the issue of whether the detention was unlawful. (See *People v. Williams* (1999) 20 Cal.4th 119, 130-134; *People v. Lopez* (1978) 81 Cal.App.3d 103, 108 ["[O]bjections to evidence must state specific grounds for exclusion, and the grounds cannot be changed on appeal [citation]. [¶] The issue, not having been preserved either by proper objection at trial or by pretrial motion, is waived and may not be raised on appeal."]; *People v. Turner* (1994) 8 Cal.4th 137, 177, disapproved on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.)

## DISPOSITION

The judgment is affirmed.

McDONALD, J.

WE CONCUR:

HUFFMAN, Acting P. J.

AARON, J.

22